Patrick Mause (AZ Bar No. 024269)
Law Office of Patrick Mause, PLLC
1830 East Broadway, Suite 124-302
Tucson, AZ 85719
Ph: 520.342.0000
Email: Patrick@PMauseLaw.com

Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Robbin Miller, an individual,<br><br>   Plaintiff,<br> vs.<br><br>Life Insurance Company of North America, a foreign insurance company,<br><br>   Defendants. | Case No.:<br><br>**COMPLAINT:**<br><br>**ERISA-GOVERNED LONG-TERM DISABILITY BENEFITS** |

For her Complaint, plaintiff Robbin Miller ("Miller" or "Plaintiff") alleges as follows:

### PARTIES, VENUE, AND JURISDICTION

1. At all material times, plaintiff Robbin Miller was a resident and citizen of Pima County, Arizona.

2. Defendant Life Insurance Company of North America ("LICNA") is a foreign insurance company authorized to do business in Maricopa County, Arizona and which was doing business in Maricopa County, Arizona.

3. While administering Miller's STD and LTD claims, defendant LICNA primarily operated under the trade name "LICNA." Currently, LICNA is operating under the trade name "New York Life." For consistency with LICNA's

current corporate branding and status, defendant LICNA will be referred to as "NY Life."

4.     Miller's claims are for long-term disability benefits and any other benefits or relief which are available to her under her employer's ERISA-governed employee welfare benefit plan (the "Plan"). *See* Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*

5.     At all material times, Miller was covered under the Plan in Pima County, Arizona through her employment with Banner Health in Pima County, Arizona.

6.     The Court has jurisdiction under ERISA, 29 U.S.C. § 1132(e).

7.     Venue is proper in this District pursuant to 29 U.S.C. § 1132(e) and 28 U.S.C. § 1391 because the breaches of the LTD plan occurred in Pima County, Arizona, and because NY Life may be found in Pima County, Arizona.

### MILLER'S SHORT- AND LONG-TERM DISABILITY PLANS

8.     Through her employment, Miller was covered under Banner Health's short-term disability (STD) and long-term disability (LTD) plans.

9.     Although Banner Health was responsible for paying benefits due under the STD plan, LICNA was responsible for administering that plan.

10.     Under the LTD plan, LICNA was responsible both for paying benefits due under the plan and for administering the plan.

11.     Under the STD plan, Miller was eligible for up to 180 days of benefits as long as she was unable to perform the material duties of her own occupation—medical sonographer for high-risk pregnancies.

12.     Under the LTD plan, and after satisfying the plan's 182 day elimination period, Miller was eligible for benefits up to her normal Social Security retirement age as long as she remained disabled under the plan.

13.     Under the LTD plan, Miller was entitled to twenty four months of benefits as long as she was unable to perform the material duties of her "Regular Occupation" and was unable to earn more than 80% of her pre-disability earnings.

14.     After twenty four months of LTD benefits, Miller was entitled to ongoing benefits as long as she was unable to perform the material duties of "any occupation" for which she was reasonable qualified and was unable to earn 80% or more of her indexed, pre-disability earnings.

15.     Because LICNA both funds and administers the LTD plan, it operates under an inherent financial conflict of interest.

16.     LICNA also has an inherent financial conflict of interest under the STD plan because, even though it does not fund the STD benefits, if it improperly denies or terminates benefits before the claimant becomes eligible for LTD benefits, it can potentially avoid liability for years' of LTD benefits.

**LICNA Approves And Pays Miller's Employer-Funded Short-Term Disability Benefits For 4½ Out Of 6 Months And, With No Improvement In Her Condition, Cuts Her Off Right Before She Became Eligible For LICNA-Funded LTD Benefits**

17.     In January 2020, Miller was working as a sonographer for high-risk pregnancies at Banner University Medical Center in Tucson.

18.     Unfortunately, Miller was also experiencing cognitive issues that prevented her from safely performing her job.

19.     Indeed, the job of medical sonographer requires intense focus and concentration because medical errors—especially for women with high-risk pregnancies—can be dangerous and potentially fatal.

20.     Because of her cognitive limitations, which one of her providers informed LICNA included the "inability to focus or concentrate" which "may

3

place others at risk for missed diagnoses," Miller was forced to stop work on January 22, 2020.

21.    Because she was unable to work, Miller applied for STD benefits with LICNA.

22.    After reviewing her claim, LICNA determined that she was unable to work as a medical sonographer and approved her claim.

23.    Over the next several months, Miller's providers continued to certify her disability to LICNA and LICNA continued to find she was entitled to benefits. Accordingly, LICNA continued to approve her claim for STD benefits.

24.    In May 2020, Miller's psychiatrist, Dr. Tyler Dowling, noted that he was recommending Miller attempt to return to work "one day per week" in an "alternative setting" and as a "reasonable accommodation." He reiterated, however, that she remained unable to work "under stress… or in higher pressure circumstances"; which would necessarily include her occupation as a medical sonographer for high-risk pregnancies.

25.    Whereas LICNA had previously had Miller's claim reviewed by a Nurse Morgan, who had repeatedly found Miller to be disabled, including in a May 26, 2020 report, LICNA had a different nurse, Nurse Hutchinson, review her claim on June 10, 2020; a mere two weeks after Nurse Morgan's latest review in which she found Miller to be disabled.

26.    In contrast to Nurse Morgan's findings, with no evidence of any material improvement in Miller's condition, and with ongoing evidence that Miller remained unable to work as medical sonographer for high-risk pregnancies, Nurse Hutchinson opined in a five-line report that "Medical does not support the restrictions of no work…"

27.    LICNA then sent a letter to Dr. Dowling with questions about her findings. Dr. Dowling responded to LICNA a week later, on June 17, 2020, reiterating his finding that Miller was not capable of safely performing an

occupation, such as her own occupation, which required "high-stake medical and/or imaging decisions…" He therefore continued to recommend her "abstinence from direct clinical care (e.g. medical imaging) for the time being – and until further neuropsychological testing is complete." Thus, he continued to advocate her graduated return to work in a different occupation.

28.     After reviewing Dr. Dowling's responses, LICNA's Nurse Hutchinson cherry-picked information favoring the termination of benefits in order to improperly reject her disability. She also consulted with a LICNA "medical director" in order to "clarify functional loss from 6.8.2020 onward."

29.     In violation of its claims-handling standards, LICNA's claim file does not document any consultation with a LICNA medical director regarding Miller's claim.

30.     Nevertheless, by letter dated June 26, 2020, LICNA denied Miller's STD benefits beyond June 8, 2020; i.e. a few weeks before she would have qualified for LICNA-funded LTD benefits.

31.     On July 12, 2020, Miller appealed LICNA's wrongful STD denial. As Miller noted in her appeal letter, "The fact that a neuropsychologist, who has never met me, determined I was able to return to work without having done a neuropsychological evaluation is inconceivable!" Miller also noted that she had "worked in diagnostic medical sonography since 1980 and high risk perinatal sonography since 1990. For me to say I have significant memory loss affecting my work should be taking seriously. I was making mistakes at work that affected patient care."

32.     Shortly thereafter, Miller provided the report of her comprehensive neuropsychological evaluation, which was performed on July 22, 2020 by Tucson neuropsychologist, Karin H. Ahlstrand, Ph.D.

33.     In her report, Dr. Ahlstrand found, among other things, that Miller had impaired "fine motor functioning," relatively weak "visuospatial

perception," reduced "Attention and processing speed," impaired "Delayed auditory memory performance," and "severely impaired to low average" results in "Delayed visual memory performance." All these cognitive tasks are essential to safely performing medical sonography, especially for high-risk patients.

34.    Based on the results of Miller's objective neuropsychological testing, Dr. Ahlstrand found "she is diagnosed with mild neurocognitive disorder (NCD)/mild cognitive impairment (MCI)."

35.    Finally, Dr. Ahlstrand noted her finding that "With regard to a return to work, my professional opinion is that Mrs. Miller's depression and anxiety alone would likely interfere substantially in her ability to adequately perform her work duties… my professional opinion is that returning to work is cognitively and psychiatrically contraindicated."

36.    Miller also provided LICNA with an FMLA form completed by her attending psychiatrist, Dr. Dowling, which noted among other things that "Patient has mild neurocognitive disorder… Her conditions (above) indeed impact work-related abilities."

37.    LICNA then sent Miller's file to notorious psychological file reviewer, Les Kertay, Ph.D. for review.

38.    Although LICNA identifies Dr. Kertay as a "Medical Director" he is not a physician or medical doctor.

39.    In violation of its claims-handling standards, LICNA omitted Dr. Kertay's report from Miller's claim file, and only produced it after a specific demand for the information.

40.    In his report, Dr. Kertay claimed Miller's "treating provider's opinion is not well supported by medically acceptable clinical diagnostic techniques including mental status examinations, psychological and/or neuropsychological testing and is inconsistent with the other substantial evidence in the claim file…"

6

41.    The reasons Dr. Kertay identified to claim Miller's treating providers' findings were "not well supported" included that "mental status examination throughout our [sic] overall benign and within normal limits" (which is false); "Although neuropsychological testing found test variability, overall performance was broadly in the low average to average range"; and "Treatment intensity is low, and inconsistent with what would be expected in an impairing psychiatric condition… the absence of referral to a higher level of care or more aggressive means to obtain psychotherapy suggests that increased treatment intensity was not found to be necessary based on clinical severity."

42.    As further discussed below, and upon information and belief, LICNA, Dr. Kertay, and other LICNA psychological/neuropsychological file reviewers constitute an enterprise that is engaged in a pattern of racketeering activity with respect to disability claims based upon mild neurocognitive disorder/mild cognitive impairment and which is perpetrated using the U.S. mails and wires.

43.    Based on Dr. Kertay's non-examining file review, LICNA notified Miller by letter dated August 27, 2020 that "an adverse benefit decision on your claim is warranted," and provided Miller with the opportunity to submit additional information.

## LICNA Improperly Denies Miller's LTD Claim, LTD Appeal, and STD Appeal

44.    On November 13, 2020, Miller applied for LTD benefits with LICNA.

45.    In connection with her LTD application, Miller provided LICNA with a letter from her attending neuropsychologist, Dr. Karin Ahlstrand, rebutting Dr. Kertay's erroneous, neuropsychologically-unsupported theories. Among other things, Dr. Ahlstrand noted that "Her delayed visual memory performances," which is a cognitive skill essential to safely and correctly

1   interpreting blurry sonogram images for high-risk pregnant women, "were

2   better than only 0.1% to 14% of her peers… One can easily see that her areas of

3   weakness are significantly below performances that… would be required for her

4   continued work in her prior capacity." Dr. Ahlstrand further noted, "My

5   professional opinion is that asking someone who provided adequate effort on

6   testing (given her performance validity results) to resume performing these

7   procedures when she is not capable of doing so and her results suggest cognitive

8   contraindications to consistently performing her work duties, could provide a

9   potentially unethical and risky situation." (parentheses by Dr. Ahlstrand).

10      46.    With her LTD application, Miller also provided LICNA with a

11   lengthy, 9-page Case Review by Tucson neuropsychologist, Dr. Scott Belanger,

12   Psy.D. in which he specifically rebutted Dr. Kertay's unsupported and unsound

13   theories. For example, Dr. Belanger noted that "Dr. Kertay opines, 'As noted

14   above, Mental Status Examination throughout our [sic] overall benign and within

15   normal limits.' • A Mental Status Examination is not sufficiently sensitive to

16   assess higher-level cognitive difficulties of the sort described by Ms. Miller in her

17   occupational functioning. Comprehensive neuropsychological evaluation is the

18   best way to do this." (bracket by Dr. Belanger). Dr. Belanger also noted that

19   several of Dr. Kertay's assertions were "false." For example, he noted that "Dr.

20   Kertay goes on to opine, 'Although neuropsychological testing found test

21   variability, overall performance was broadly in the low average to average

22   range.' • This is false. Dr. Ahlstrand documents impairment in many areas of

23   cognition (see above) that would be expected to interfere with occupational

24   performance." And as Dr. Belanger concluded, "Based on my

25   neuropsychological knowledge and expertise, it is my opinion, to a reasonable

26   degree of neuropsychological certainty that Ms. Miller is cognitive disabled."

27      47.    On December 16, 2020, LICNA informed Miller that it intended to

28   deny her STD appeal based on an addendum by Dr. Kertay. Again, in his

8

addendum, Dr. Kertay dishonestly focused on the claimed fact that Miller's "mental status examination throughout are overall benign and within normal limits."

48.     On January 8, 2021, Miller provided LICNA with a letter from Dr. Belanger responding to Dr. Kertay's addendum. As Dr. Belanger again noted, "a Mental Status Examination is not sufficiently sensitive to assess higher-level cognition. Comprehensive neuropsychological evaluations are the best way to do this, and the evaluation performed by Dr. Ahlstrand documented <u>impairment</u>" in several areas including "in visual memory, impairment in visuospatial organization and planning."

49.     On January 19, 2021, Miller sent LICNA a letter from her attending psychiatrist, Dr. Dowling, further refuting Dr. Kertay's theories. For example, Dr. Dowling noted that "Mental status exams are not an adequate substitute for rigorous and time intensive neuropsychological tests. Specifically, the mental status exam does not reliably ascertain comprehensive objective information regarding detailed cognitive function." And as Dr. Dowling further noted, "there was no medical basis for any conclusion that she could reliably perform her job."

50.     On February 3, 2021, LICNA wrongly denied Miller's STD appeal. As with its other wrongful decisions, LICNA's STD appeal denial was based exclusively on the opinions of non-examining and non-treating Dr. Kertay to the wholesale exclusion of the findings of Miller's attending psychiatrist, Dr. Dowling; her attending neuropsychologist, Dr. Ahlstrand; and independent neuropsychologist, Dr. Belanger.

51.     On February 10, 2021, Miller wrote to LICNA and noted multiple flaws in Dr. Kertay's reviews and in LICNA's decision. Miller further noted that her claim had "not been handled fairly and in good faith" and that it "also has not been handled with the obligations imposed under [LICNA's] Regulatory Settlement Agreement (copy enclosed)."

9

52.     On February 12, 2021, and again improperly relying exclusively on Dr. Kertay's flawed theories, LICNA denied Miller's LTD claim. That letter informed Miller that she could appeal LICNA's LTD denial within 180 days of her receipt of that letter.

53.     On February 17, 2021, LICNA sent another letter stating that it was denying Miller's STD appeal. That letter stated that if Miller "disagree[d] with our decision and wish to have it reviewed" she could "Submit your appeal letter to us within 180 days of your receipt of this letter." LICNA's letter further noted that, as part of her appeal, "You may also submit additional information" and that "the appeal process will provide for a review that does not afford deference to the claim determination and will be conducted by a person who is neither the individual who made the claim determination, nor the subordinate of such individual."

54.     On March 1, 2021, Miller appealed LICNA's decision denying her STD appeal. After noting that "Unless [LICNA] is advocating that Banner Health subject its patients and unborn children to medical care from impaired providers, [LICNA] should immediately reverse its wrongful and unsupported decision and reinstate Ms. Miller's STD benefits." And as she concluded, "please consider Ms. Miller's appeal based on the information [LICNA] already has on file regarding Ms. Miller's claim."

55.     In violation of ERISA and the STD plan terms, LICNA wrote to Miller on March 4, 2021 stating "we cannot consider this an appeal until you submit new medical information… Please refer to our denial letter of 2/17/21 for your client's appeal rights… The new request must include new information to support your client's claim."

56.     On March 11, 2021, Miller responded to LICNA's March 4 letter pointing out that its refusal to consider her STD appeal was contrary to the

10

permissive language of its February 17, 2021 letter; and re-requesting that LICNA have her claim "reviewed by a truly independent professional."

57.    On March 18, 2021, LICNA doubled-down on its wrongful refusal to consider Miller's voluntary STD appeal.

58.    On July 30, 2021, Miller timely appealed LICNA's wrongful decision denying her LTD claim. As Miller noted in her appeal letter, "Dr. Kertay's opinion, however, is psychologically unsupportable and falls below the standard of care for any practicing psychologist. It is frankly malpractice for a psychologist to opine that the results of a patient's *mini* mental status exam — which is a brief, insensitive cognitive screening tool — somehow override the findings of the patient's comprehensive neuropsychological evaluation and the findings of the patient's attending psychiatrist."

59.    On September 8, 2021, LICNA informed Miller that it intended to deny her LTD appeal based on a review by a non-examining neuropsychologist, Dr. Jeremy Hertza.

60.    Upon information and belief, and like Dr. Kertay, Dr. Hertza is relied upon to provide insurance companies with biased, outcome-focused, preordained denial opinions in cases in which claimants have documented (or undocumented) neurocognitive deficits.

61.    Like Dr. Kertay, Dr. Hertza unfairly and unreasonably focused on Miller's "mental status exam" notations in order to improperly discount and disregard the objective findings of her attending psychiatrist and neuropsychologist. Specifically, Dr. Hertza noted that "Based on the information provided, the claimant does not have any significant limitations noted on mental status exam related to depression, anxiety, and posttraumatic stress disorder." He then further noted that "The claimant is not totally dependent for activities of daily living due to mild cognitive disorder [sic] and the claimant does not have any measurable evidence of psychomotor agitation, hallucinations, delusions,

poor appetite, lack of motivation, homicidality, suicidality (intent or plan), self-destructive behaviors, nor involuntary hospitalizations due to a psychiatric emergency. The claimant has not required a higher level of care. Therefore, no restrictions and limitations are warranted."

62.    Under the LTD plan, Miller need not be" totally dependent for activities of daily living due to mild cognitive disorder [sic]" or have "psychomotor agitation, hallucinations, delusions, poor appetite, lack of motivation, homicidality, suicidality (intent or plan), self-destructive behaviors, [or] involuntary hospitalizations due to a psychiatric emergency" in order to qualify for LTD benefits. Instead, she merely must be unable to safely and adequately perform the material duties of her own occupation — medical sonographer for high-risk pregnancies — in order to qualify for benefits. Accordingly, the fact that she does not have "hallucinations, delusions" is irrelevant to her claim.

63.    Additionally, and as discussed below, LICNA has a pattern of racketeering activity with respect to disability claims based on cognitive deficits in which, even when claimants have abnormal findings and impairments documented on Mental Status Examinations, and even when they have required a higher level of care including inpatient psychiatric treatment and intensive outpatient treatment, LICNA still denies their claims due either to other allegedly "normal" information or the lack of the same type of neuropsychological testing that objectively documents deficits that Miller had here.

64.    On October 8, 2021, Miller responded to LICNA's and Dr. Hertza's theories. Among other things, Miller asked LICNA to provide information that would illuminate its biased handling of cognitive disability claims; provided a letter from Dr. Dowling noting that mental status examinations are "not a reliable indicator of whether she retains the advanced skills and abilities

necessary to consistently perform her job" and that "the neuropsychological testing consistently demonstrates, there are neurological impairments that indeed relate to Ms. Miller's underlying ability to perform her work"; a letter from Dr. Belanger reiterating that "A Mental Status Examination is not sufficiently sensitive to assess higher-level cognitive difficulties"  and that although she "shows improvement on her most recent neuropsychological evaluation [from April 2021], she continues to show deficits in areas of cognition that would be considered crucial to the duties of Registered Diagnostic and Medical Sonographer, most notably visuospatial skills"; the report of Miller's repeat, April 2021 neuropsychological testing that objectively documented her ongoing and disabling deficits in "visuospatial perception" and that therefore her diagnosis if MCI/NCD "will remain in place"; a letter from Dr. Ahlstrand reiterating Miller's continuing diagnosis of MCI/NCD and that if Miller attempted to work she "could suffer increased symptoms of depression and anxiety"; and medical records from Dr. Dowling noting that although Miller's anxiety and depression had briefly improved in the spring of 2021, which coincided with her repeat neuropsychological testing, that her improvement was fleeting and her depression and anxiety quickly retrogressed.

65. On November 15, 2021, LICNA informed Miller that it intended to deny her appeal based on a biased addendum by Dr. Hertza that claimed, among other things, that "the claimant has shown steady improvements in her symptoms of anxiety and depression as well as the findings on her mental status examination, with no abnormalities significantly appreciated."

66. After Miller wrote to LICNA on November 19, 2021 noting that "It is clear that [LICNA] has no intention of performing a fair review of Miller's LTD claim" and, instead, "continues to cherry-pick information, misinterpret the facts, and rely on grossly inappropriate standards to deny her claim" and that LICNA

should therefore "proceed with a final decision on her claim," LICNA denied her LTD appeal by letter dated December 7, 2021.

## LICNA's Pattern Of Racketeering Activity Relating To The Administration Of Cognitive Disability Claims

67.     LICNA has a pattern of racketeering activity relating to the administration of cognitive disability claims.

68.     At all times material hereto, LICNA conducted its pattern of racketeering activity through the use of the U.S. mail and wires.

69.     More specifically, LICNA has deliberately fostered and encouraged the use of fraudulent means to wrongfully deprive disabled claimants of disability benefits to which they are entitled, as set forth further below.

70.     In Dr. Kertay's review of Miller's claim, he opined that disabling restrictions and limitations were not supported because "mental status examination throughout our [sic] overall benign and within normal limits. Despite complaints of difficulty with concentration, attention, and memory, throughout the records attention and concentration are within normal limits and/or found to be consistent with symptoms associated with baseline personality functioning, Ms. Miller is treated as (and in the case of Dr. Ahlstrand referenced as) a reliable historian, and Ms. Miller is noted to perform ADLs and IADLs normally." He further noted that "Treatment intensity is low, and inconsistent with what would be expected in an impairing psychiatric condition… the absence of referral to a higher level of care or more aggressive means to obtain psychotherapy suggests that increased treatment intensity was not found to be necessary based on clinical severity."

71.     In another LICNA claim involving a person who will be referred to as "Claimant 2", Dr. Kertray performed a psychological review in which he likewise opined that the claimant did not have disabling restrictions and

14

limitations. In that case, and in contrast to Miller's case, Dr. Kertay noted that "Mental status examination findings were variable…" He further noted that "Treatment intensity has been low, and inconsistent with what would be expected in an impairing psychiatric condition… Psychotherapy is being provided on a weekly basis, recently decreased in frequency, which is a frequency and intensity that can be, and normally is, delivered concurrent with work. There is no indication of consideration for more intensive treatment." With respect to psychological screening tools, Dr. Kertay further noted that "scores on these screening measures are suggestive of reported symptoms, but cannot be by themselves considered to be diagnostic." In an addendum, Dr. Kertay addressed additional information that was provided, including a MOCA test which the provider noted indicated that "there is a mild cognitive impairment". Dr. Kertay responded that "the MOCA is a screening instrument, and is not considered diagnostic." Based on Dr. Kertay's opinions (and the opinions of other reviewers), LICNA denied Claimant 2's claim.

72.     In another LICNA claim involving a person who will be referred to as "Claimant 3", a different LICNA "Medical Director," psychiatrist Eugene F. Simopoulos, M.D., performed a file review. In that case, Claimant 3's "mental status exam" findings were frequently abnormal (such as "Behavior: cooperative, tearful"; "Mood: 'it's just too much'"; "Affect: dysphoric, anxious"; "Associations: Tight"; "Recent and Remote Memory: Grossly impaired to content of interview"; "Attention Span/Concentration: Grossly impaired to content of interview, requires repetition and occasional redirection"). Additionally, Claimant 3 was referred for "more intensive treatment" including inpatient psychiatric treatment followed by intensive outpatient treatment. Finally, Claimant 3 had also undergone comprehensive neuropsychological testing which revealed a diagnosis of MCI/NCD. LICNA's Dr. Simopoulous, however, opined that Claimant 3 did not have disabling restrictions or limitations, noting

that "the customer's documented mental status exams were predominantly normal… her thought process and cognition were consistently normal and intact. The customer underwent neuropsychological testing in 04/2021 and the results indicated that she fell in the average/low average range with only mild cognitive impairment. She scored a 30/30 on the MMSE, which is indicative of no cognitive impairment… The records indicated that she was attending a PHP [partial hospitalization program], but those records were not provided for review. As a result, it was not possible to determine the intensity of the program, her level of participation, and/or her response to the higher level of care." Based on Dr. Simopoulos' review, LICNA denied Claimant 3's claim.

73.    Plotting LICNA's conflicting rationales on a grid helps illuminate its pattern of racketeering activity relating to the administration of cognitive disability claims:

|  | **Miller** | **Claimant 2** | **Claimant 3** |
|---|---|---|---|
| **Neuropsychological Testing Finding MCI/NCD** | ✓ | X | ✓ |
| **Abnormal Mental Status Exams** | X | ✓ | ✓ |
| **Abnormal MOCA or MMSE** | X | ✓ | X |
| **Referral to Higher Level of Care (Inpatient, PHP, IOP)** | X | X | ✓ |
| **Finding and Certification of Disability By Attending** | ✓ | ✓ | ✓ |

| Providers | | | |
|---|---|---|---|
| LICNA Decision | *Denied* | *Denied* | *Denied* |

74.    As this grid shows, regardless of whether a claimant had neuropsychological testing confirming impairing deficits, abnormal mental status examinations, abnormal MOCA or MMSE testing, or referral to a higher level of care such as inpatient or intensive outpatient treatment, LICNA's reviewers claimed that all claimants had no disabling restrictions and limitations. This demonstrates a *prima facie* case of a pattern of racketeering activity with respect to the administration of cognitive disability claims by LICNA.

75.    Additionally, and in furtherance of its pattern of racketeering activity, and in violation of its obligations to include all "relevant" information in an insured's claim file, LICNA omitted its file reviewers' reports from the claim files of all three claimants, falsely stated that it had produced the claimants' claim files, and only produced the reviewers' reports after specific requests for that information.

76.    Due to LICNA's pattern of racketeering activity relating to cognitive disability claims, Miller specifically requests the right to, and leave to amend her Complaint following the ERISA-required bias and conflict of interest discovery (much of which will overlap with pattern and practice discovery) to seek any and all available legal, equitable, and statutory relief to which she may be entitled and which may be warranted.

**LICNA's Obligations Under Its "Regulatory Settlement Agreement" With Insurance Regulators, Which It Repeatedly Violated In Administering Miller's Claim And Which It Habitually Violates As Part Of Its Unfair Business Practices**

77.     On May 13, 2013, LICNA entered into a Regulatory Settlement Agreement ("RSA") to resolve allegations of improper claims handling uncovered during a Targeted Market Conduct Examination Disability Income Insurance Claim Handling Practices.

78.     In the RSA, LICNA agreed to implement "a plan of corrective action."

79.     Under the RSA, LICNA agreed to use "best practices for adjusting group LTD claims."

80.     There is no justification for LICNA using anything less than its agreed-up "best practices" in administering STD claims.

81.     In the RSA, LICNA agreed to provide its claim-reviewing personnel "all available medical, clinical, and/or vocational evidence in the Disability Claim File… both objective and subjective, concerning impairment."

82.     LICNA further agreed to gather and consider appropriate medical documentation, including medical records, medical texts and articles, and the claimant's own statements.

83.     LICNA further agreed that if presented with "[v]ague statements of impairment" such as "Claimant is totally disabled," "it is appropriate to seek further clarification from the treatment provider making the vague statements."

84.     LICNA further agreed to consider co-morbid or co-existing conditions that may impact functionality.

85.     LICNA further agreed to "[m]ake appropriate decisions by providing a thorough, fair and objective evaluation of all claimants."

86.     LICNA further agreed that its "Clinical, Vocational, and Medical Professionals" would abide by a "Statement Regarding Professional Conduct" that requires them, among other things, to: "Discuss medical and/or vocational facts in an open and honest manner"; "Provide fair and reasonable evaluations considering all available medical and/or vocational evidence, both objective and

18

subjective, both supporting impairment and supporting capacity"; "Consider all diagnoses and impairments, and their effect on the whole person, when evaluating medical and/or vocational data in a claim file"; "Represent medical and/or vocational facts accurately"; and "Provide reasonable, clear, and accurate explanations of professional opinions so that clear and full explanations of decisions based on those opinions are available to the claimant."

87.     In administering Miller's claim, LICNA violated multiple obligations under the RSA.

88.     In administering Miller's claim, LICNA violated its obligations to handle her claim fairly and objectively.

89.     In administering Miller's claim, LICNA violated its fiduciary obligations under ERISA. *C.f.* 29 U.S.C. § 1104(a)(1) ("a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries").

90.     At all times material hereto, LICNA deliberately acted contrary to its obligations under the RSA, and contrary to its fiduciary duties under ERISA, in order to maximize its profits at the expense of its insureds who depended on LICNA to handle their claims fairly and in an unbiased fashion.

## LICNA's And Its Employees' Financial Conflicts Of Interest Infected The Claim Process And Denied Miller The Full And Fair Review To Which She Is Entitled

91.     The STD plan is "self-insured" by Banner Health but is administered by LICNA, which is responsible for deciding claims under the STD plan.

92.     The LTD plan is funded by an insurance policy issued by LICNA to Miller's employer.

93.     LICNA is the STD and LTD plans' claim administrator and therefore decides whether claimants like Miller are entitled to benefits.

94.     If LICNA finds a claimant like Miller is entitled to LTD benefits it is responsible for paying those benefits.

95.     Consequently, LICNA has an inherent financial conflict of interest because it has to decide entitlement to LTD benefits and then pay those benefits when it finds a claimant is totally disabled.

96.     LICNA's conflict of interest is further enhanced by the fact that it administers but does not insure the STD plan because it gives LICNA a tremendous interest in denying STD benefits in order to try to preclude claimants from obtaining LTD benefits.

97.     Upon information and belief, and as it did in Miller's case, LICNA deliberately terminates claimant's STD benefits prematurely in order to prevent them from seeking or qualifying for LTD benefits.

98.     LICNA's dual role, decider-and-payor scheme creates an inherent financial conflict of interest for LICNA.

99.     Upon information and belief, LICNA has not walled-off claims personnel from this financial conflict of interest. Instead, LICNA has deliberately fostered a financially-conflicted environment among its employees by, among other things, tying their compensation to the company's overall financial performance.

100.     Upon information and belief, LICNA's employees, including those involved in Miller's claim, are eligible for annual employee bonuses and/or other incentive pay.

101.     Upon information and belief, LICNA's employee bonuses and/or other incentive pay are based at least in part on LICNA's overall financial performance.

102.     Upon information and belief, LICNA's employees, including those involved in Miller's claim, know and are informed that the more claims LICNA approves, the more benefits LICNA will have to pay.

103. Upon information and belief, LICNA's employees, including those involved in Miller's claim, know and are informed that the fewer claims LICNA approves, the better the company's overall financial performance will be.

104. Upon information and belief, LICNA's employees, including those involved in Miller's claim, know and are informed that paying more claims will lower the company's overall financial performance and thereby reduce their potential bonuses or incentive pay.

105. By tying employee compensation to the company's overall financial performance through its bonus or incentive compensation program, LICNA has deliberately fostered a financial conflict of interest among the employees involved in Miller's claim.

106. Upon information and belief, LICNA's insurance adjusters, including those involved in Miller's claim and who made the final decision to terminate Miller's claim and deny her appeal, are not permitted to question the findings of LICNA's "nurse case managers" or non-physician "medical directors" even if they know countervailing evidence of disability exists and even if that information was ignored by LICNA's medical and/or vocational personnel.

107. Upon information and belief, LICNA's insurance adjusters and other employees are trained and expected to focus on information supporting the non-payment of benefits rather than the information supporting the payment of benefits.

108. The effects of LICNA's and its employees' financial conflicts of interest are evident in numerous aspects of its handling of Miller's claim, including but not limited to the multiple procedural irregularities LICNA committed in the course of handling Miller's claim; LICNA's multiple failures to comply with the terms of its RSA and/or its disregard for or minimization of its

obligations under the RSA; and LICNA's multiple failures to comply with basic and industry standard claims-handling principles.

109.    Upon information and belief, LICNA deliberately withholds evidence of its and its employees' financial conflicts of interests from disability claim files in order to 'stack the evidentiary deck' in its own favor. *See e.g. Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 675 (9th Cir. 2011) ("Usually the record does not disclose an insurance company's claims-handling history in other cases or its internal directives to claims managers about how to evaluate claims. Thus we are ordinarily ignorant of much of what we are supposed to 'weigh.' For all we know, the claims administrator evaluating Salomaa's claim would be voted for promotion based on the percentage of claims rejected, or had formed a personal opinion (or his boss had) that all chronic fatigue syndrome claims were fraudulent.").

Discovery is warranted and necessary, even under the *de novo* standard of review, to expose LICNA's, its employees', and its allegedly independent consultants' financial conflicts of interest and biases and the manners in which those conflicts and biases infected the claim process, influenced or affected the actions of LICNA and its employees and consultants, and deprived Miller of the full and fair review to which she is entitled. *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 901–02 (9th Cir. 2016) ("Mr. Demer's argument here is comparable to conventional approaches to discrediting the testimony of retained experts whose objectivity may be challenged based on, *e.g.*, the number of times he or he has served as an expert in support of a party and the amount of compensation received. This alleged conflict of interest is distinct from the purported structural conflict of interest discussed above. The lack of any structural conflict of interest on the part of MetLife does not preclude MetLife from having a conflict of interest based on an IPC's financial interests; the factors that raise the possibility of a structural conflict relate to the incentives applicable to MetLife's *claims*

*department*, whereas the factors that raise the possibility of a financial conflict relate to the incentives applicable to MetLife's *retained experts.* Even if MetLife operated with no structural conflict, reliance on the reports of its retained experts who have a financial incentive to make findings favorable to MetLife may warrant skepticism."); *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1011 (9th Cir. 2004) ("Evidence was also presented that Defendants exhibited bias in selecting and retaining Dr. Swartz as the IME. Paul Revere used Dr. Swartz nineteen times from 1995 to 2000… evidence showed that in thirteen out of thirteen cases involving claims for total disability, Dr. Swartz rejected the insured's claim that he or she was totally disabled."); *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007) ("introduction of evidence beyond the administrative record could be considered necessary [in] claims that require consideration of complex medical questions or issues regarding the credibility of medical experts… instances where the payor and the administrator are the same entity and the court is concerned about impartiality" (citation omitted)); *Hertz v. v. Hartford Life & Acc. Ins. Co.*, 991 F. Supp. 2d 1121, 1136 (D. Nev. 2014) ("Dr. Rim did not find that a single claimant was completely unable to perform any type of work. Accordingly, Dr. Rim found that 100% of all claimants could perform some type of work. The Court finds these statistics strongly suggest that both MLS and Dr. Rim harbored a significant bias towards finding a claimant capable of performing some type of work." (docket citation omitted)); *Watson v. Metro. Life Ins. Co.*, No. CV-11-01393-PHX-GMS, 2012 WL 5464986, at *9 (D. Ariz. Nov. 8, 2012) ("This proceeding is a trial on the administrative record, and Watson's allegations go to the weight that the Court should assign the evidence and conclusions of the MetLife consultants. If all of these issues would be relevant in an abuse of discretion case, they are just as relevant in a de novo case.").

## COUNT ONE: CLAIM FOR LONG-TERM DISABILITY BENEFITS
## UNDER ERISA, 29 U.S.C. § 1132(A)(1)

110.    Plaintiff incorporates the preceding allegations as though fully set forth herein.

111.    Miller incorporates the preceding allegations as if fully set forth herein.

112.    Miller was totally disabled as defined under the LTD plan.

113.    Miller has been damaged by LICNA's improper decision terminating her LTD benefits.

114.    If LICNA alleges it has discretion to determine entitlement to benefits, upon information and belief such an alleged delegation of discretion is improper for multiple reasons, including but not limited to the fact that the plan administrator either did not retain discretion for itself or failed to properly delegate any discretion to LICNA, and because any documents allegedly conferring discretion upon LICNA are not plan documents. Such documents are therefore not controlling.

115.    Even if LICNA is found to have discretion to determine entitlement to benefits, LICNA abused its discretion because its decision terminating Miller's benefits was arbitrary and capricious, unreasonable, not well founded, was caused or influenced by LICNA's, its employees' and consultants', and the Plan's financial conflicts of interest, and was plagued by "procedural irregularities" under ERISA, all of which precluded the full and fair review required by ERISA, 29 U.S.C. 1133(2) and 29 C.F.R. § 2560.503-1(g)(1) and (h)(2).

116.    Under the *de novo* standard or review, LICNA's decision was erroneous, contrary to the plan terms, contrary to the medical evidence, and driven or biased by LICNA's and its employees' and consultants' inherent financial conflicts of interest. Miller is entitled to continuing LTD benefits under the Plan.

117.    LICNA has a biased and parsimonious claims handling history.  *See e.g. Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 678 (9th Cir. 2011) (finding LICNA and the LTD plan in that case "violated its procedural obligations and violated its substantive obligation by abusing its discretion and judging the disability claim arbitrarily and capriciously. Our skepticism of its approach is heightened because of its conflict of interests."); *see also* LICNA Regulatory Settlement Agreement.

118.    LICNA has a long history of improper claim administration.  *Id.*

119.    LICNA violated the terms of the Regulatory Settlement Agreement in administering Miller's claim, denying her claim, and denying her appeal.

120.    LICNA violated industry standard and generally accepted claims-handling principles in administering Miller's claim, denying her claim, and denying her appeal.

121.    LICNA deliberately reviewed Miller's STD claim with an eye toward denying that claim in order to potentially preclude Miller from applying for or receiving LICNA-funded LTD benefits.

122.    Miller is entitled to discovery and to introduce evidence showing the effects of LICNA's and its employees' and consultants' financial conflicts of interest and biases on the decision denying Miller's claim and on the procedural irregularities that infected the claim process.

123.    Pursuant to ERISA, Miller is also entitled to discovery regarding, among other things, the biases and credibility of the personnel LICNA relied upon to terminate her STD benefits. *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 901–02 (9th Cir. 2016); *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007); *Watson v. Metro. Life Ins. Co.*, No. CV-11-01393-PHX-GMS, 2012 WL 5464986, at *9 (D. Ariz. Nov. 8, 2012).

124.    Pursuant to ERISA, Miller is entitled to take discovery, introduce evidence, and have a bench trial regarding, among other things, the biases and

credibility of the medical and vocational personnel LICNA relied upon to terminate and deny Miller's claim. *Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 901–02 (9th Cir. 2016); *Opeta v. Nw. Airlines Pension Plan for Contract Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007); *Nolan v. Heald Coll.*, 551 F.3d 1148, 1154 (9th Cir. 2009) ("Instead, without evidentiary hearing or bench trial, the district court considered and rejected Nolan's bias argument by weighing the documentary evidence of bias, and ignoring the protections that summary judgment usually affords the non-moving party. Though the district court would have been permitted to weigh such evidence after bench trial, weighing that evidence on summary judgment was improper in this case where the evidence was outside of the administrative record."); *Watson v. Metro. Life Ins. Co.*, No. CV-11-01393-PHX-GMS, 2012 WL 5464986, at *9 (D. Ariz. Nov. 8, 2012) ("This proceeding is a trial on the administrative record, and Watson's allegations go to the weight that the Court should assign the evidence and conclusions of the MetLife consultants. If all of these issues would be relevant in an abuse of discretion case, they are just as relevant in a de novo case."); *Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841, 843 (7th Cir. 2009) ("Evidence is essential if the court is to fulfill its fact-finding function. Just so in ERISA litigation. When review is deferential—when the plan's decision must be sustained unless arbitrary and capricious—*then* review is limited to the administrative record… Otherwise, however, the court decides on the record made in the litigation. And, if material evidence conflicts, then there must be a trial.").

125.    Miller has been injured and suffered damages in the form of lost LTD benefits as a result of LICNA's wrongful decision terminating her disability benefits and denying her appeal.

126.    Miller has been injured and suffered damages in the form of lost LTD benefits as a result of LICNA's wrongful conduct.

127.   Upon information and belief LICNA's return on equity for the year 2021 exceeded 15%.

128.   Pursuant to ERISA, 29 U.S.C. § 1132(a)(1) and/or § 1132(a)(3), Miller is entitled to recover unpaid disability benefits, prejudgment interest at the maximum allowable legal or equitable rate but at a rate no lower than the maximum rate at which LICNA earned interest and/or return on equity on Miller' unpaid disability benefits, reasonable attorney's fees and costs, and other appropriate relief.

WHEREFORE plaintiff Robbin Miller prays for relief as follows:

A.   For long-term disability benefits due under her LICNA-funded LTD plan;

B.   For any other benefits Miller may be entitled to receive under her employer's ERISA-governed benefits plan due to her disability;

C.   For leave to amend her Complaint once further evidence of LICNA's pattern of racketeering activity is illuminated through ERISA-required bias and conflict discovery;

D.   For pre- and post-judgment interest at the maximum allowable legal or equitable rate but in no event at a rate lower than the rate at which LICNA profited, earned return on interest, earned return on equity, or otherwise benefitted from the wrongful denial and withholding of Miller's LTD benefits;

E.   For attorney's fees and costs incurred as a result of prosecuting this suit pursuant to 29 U.S.C. § 1132(g); and

F.   For any other relief the Court deems just, proper, or equitable.

DATED this 29th day of September, 2022.

LAW OFFICE OF PATRICK MAUSE, PLLC

By: _s/ Patrick W. Mause_
      Patrick W. Mause
      Attorney for Plaintiff